**Roger SEFZIK and Jennifer Sefzik, Appellants,**

v.

**CITY OF McKINNEY, Appellee.**

No. 05–04–00609–CV.

Court of Appeals of Texas, Dallas.

Aug. 15, 2006.

886

Steven Baggett, James B. Harris, Thompson & Knight, L.L.P., Dallas, TX, for appellants.

Mark E. Goldstucker, Brown & Hofmeister, L.L.P., Richardson, TX, Edwin P. Voss, Jr., Robert F. Brown, Brown & Hofmeister, L.L.P., Dallas, TX, for appellee.

Before Justices WRIGHT, MOSELEY, and LANG.

## OPINION

Opinion by Justice MOSELEY.

The City of McKinney conditioned approval of a subdivision development on the payment of certain road construction costs. The developer's assignees, Roger and Jennifer Sefzik, alleged the City imposed an improper exaction as a condition to obtaining a building permit to develop the land, thereby taking private property without providing adequate compensation in violation of article I, section 17 of the Texas Constitution. Both parties moved for summary judgment. The trial court denied the Sefziks' motion and granted the City's motion on the basis of waiver and estoppel. The Sefziks contend that the trial court erred in granting the City's motion for summary judgment. Because none of the grounds urged in the City's motion can support summary judgment for the City, we reverse the trial court's final judgment and remand this case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The property at issue here is a parcel of approximately fifteen acres known as Lot

1, Block A of the Creek Point Addition of the City. The property was to be developed as an apartment complex. The property is bounded on the west by State Highway 5. Wilmeth Road intersects with State Highway 5 in a "T" configuration, close to the southern boundary of the property. Wilmeth Road extends west from that intersection, but does not extend east of State Highway 5. The City's thoroughfare plan shows a future extension of Wilmeth Road (New Wilmeth Road) east across State Highway 5, which will cross the southwest corner of the property as well as a flood plain. However, when and if it is built New Wilmeth Road will not directly access the development.

In September 1999, the Sefziks, who owned the property, contracted to sell it to Picerne Development Corporation. Picerne later assigned the contract to the developer, Creek Point, L.P. Under the contract of assignment, the closing on the purchase of the property was to occur in late May 2000.

Creek Point applied to the City for approval to develop an apartment complex on the property. The development was designed to qualify for tax exempt bonds issued by the State of Texas to assist in developing affordable housing. Creek Point had succeeded in reserving such bonds, subject to a non-negotiable expiration date in late May 2000. Thus Creek

Point had to close on the purchase of the property and have the City's approval of the project in place by late May 2000, or else it would lose its tax-exempt bond financing.

In mid-April 2000, the City informed Kurt P. Kehoe (a Picerne officer who was in charge of the approval process) and Creek Point representatives that, as a condition to the City's approval of the proposed development, Creek Point would have to construct the part of New Wilmeth Road that crossed the property. The City contended that the thoroughfare plan, showing the road crossing the property, and section 40–6 of the McKinney City Code required Creek Point to construct, at the time of or prior to construction of the primary development, the portion of the Wilmeth Road extension crossing its property.[1] Kehoe and others complained to the City about this requirement. Kehoe believed the construction of the road across a flood plain would "require extensive effort and expense."

At an April 11, 2000 planning and zoning commission meeting to review the site plan, Creek Point representatives objected to the requirement to build New Wilmeth Road. However, City representatives told Creek Point that it would have to either construct a portion of New Wilmeth Road or enter into a Facilities Agreement[2] to

---

**1.** Section 40–6 is titled "Improvements required" and provides:

> All of the improvements required under these regulations, or improvements specified in the comprehensive plan of the city, or improvements which, in the judgment of the city engineer, are necessary for the adequate provision of streets, utilities, drainage, services, and facilities to the subdivision and to surrounding areas of the city, shall be constructed at the sole expense of the developer, unless other provisions are approved by the city council. Payment for any and all improvements which are not to

> be made at the time of the primary construction of the subdivision or development shall be made a part of a binding contractual facilities agreement, signed by the developer and approved by the city council.

McKINNEY, TEX., CODE OF ORDINANCES § 40–6 (2006) (current version at http://www.municode.com/resources/gateway.asp?sid=43 & pid=11770 ) (last visited Aug. 15, 2006). Section 40–6 in effect at the time of Creek Point's application is not in the record on appeal. Therefore, we cite the current section.

**2.** Section 40–31 is titled "Facilities agreement" and provides, in part:

pay $269,360 for a portion of the road.[3] At the May 16, 2000 hearing of the city council, Kehoe presented his concerns regarding the propriety and fairness of the "ultimatum" to build or pay for part of New Wilmeth Road as a condition to developing the property. At that hearing, the Sefziks argued that New Wilmeth Road would never benefit the property due to the lack of access and the flood plain, and proposed to modify the Facilities Agreement by limiting the payment to roadway impact fees only, not the assessment of New Wilmeth Road construction costs. The city council rejected the proposal, voting to accept the Facilities Agreement.

On May 24, 2000, after the city council meeting, Creek Point and the Sefziks amended their purchase contract to reduce the sales price. At the same time, and in

> A subdivider shall be required to enter into an agreement with the city which shall govern his subdivision if there are pro rata payments, city participation in cost, escrow deposits or other future considerations, other nonstandard development regulations or if all improvements required to be dedicated to the city will be not [sic] completed prior to filing the record plat, minor plat, or final plat in the county records....
>
> McKinney, Tex., Code of Ordinances § 40–31 (2006) (current version at *http://www.municode.com/resources/gateway.asp?sid=43 & pid=11770* ) (last visited Aug. 15, 2006). Section 40–31 in effect at the time of Creek Point's application is not in the record on appeal. Therefore, we cite the current section.

3. In section C, the Facilities Agreement describes the extension of Wilmeth Road for which Creek Point "is responsible for," and also provides:

> I. **VARIANCES**
> It is expressly acknowledged that the following variances and only those variances stipulated herein, to the Zoning Ordinance and Subdivision Controls are granted by the CITY for this subdivision and/or development.
> 1. Construction of [New Wilmeth Road] as approved by the City Council shall be deferred until such time as the City deter-

exchange for the price reduction, Creek Point assigned the Sefziks any and all claims it had against the City. The Assignment and Agreement document states:

> Both parties agree that the imposition of the Fees [in the amount of $269, 360 for the construction of New Wilmeth Road] by the City is based upon questionable legal grounds as the Road and bridge add no value or utility to the Property, but acknowledge that in order for the project to proceed after closing, [Creek Point] may be required to pay such Fees at the time the building permit is issued.

Creek Point signed the Facilities Agreement on July 19, 2000; the City signed it on July 28, 2000. The City issued a building permit to Creek Point in December 2000.

> mines to construct said roadway. City shall construct or contribute to the construction of Wilmeth Road.
> 1. [sic] DEVELOPER's payment of the cost of the Wilmeth Road roadway, utility, and drainage improvements at the time of Building Permit issuance ... shall be deemed to satisfy DEVELOPER's obligation for the construction of Wilmeth Road and DEVELOPER's Roadway Impact Fees. Payment of said Wilmeth Road costs, in the amount of $269,360.00 fully discharges DEVELOPER's obligation for Thoroughfare construction (Wilmeth Road) as provided for in Section C above ...

Section 40–8 of the McKinney Code of Ordinances provides for variances: "Suspension of any of these rules and regulations may be granted by the city council upon a good and sufficient showing by the owner ... that enforcement of the provisions of this chapter will deprive the applicant of a substantial property right...." McKinney, Tex., Code of Ordinances § 40–8 (2005) (current version at *http://www.municode.com/resources/gateway.asp?sid=43 & pid=11770* ) (last visited Aug. 15, 2006). Previous section 40–9 providing for variances was renumbered in 2002.

In July 2002, the Sefziks sued the City. In their first amended original petition, the Sefziks asserted that they had been assigned Creek Point's claims against the City for imposing the requirement to build or pay for New Wilmeth Road. They alleged the City conditioned the issuance of a building permit on a requirement that funding be provided for the future construction of a road not needed to handle traffic from the new development. Specifically, they alleged that New Wilmeth Road did not further any legitimate state interest in connection with the property because it did not address or lessen traffic impact resulting from the property development, and that there was no "rough proportionality" between the traffic generated by the property development and the need to extend Wilmeth Road because the extension, if it occurred at all, would be in the future after development was completed and additional traffic demand from the property was already imposed on the City's roadways. They requested that the court find that a taking had occurred and requested as damages adequate compensation, pursuant to article I, section 17 of the Texas Constitution and the Declaratory Judgments Act. They also pleaded for recovery of attorney's fees pursuant to section 37.009 of Declaratory Judgments Act.

After the Sefziks filed suit, the City realized Creek Point had not paid the $269,360; it then filed a third-party petition against Creek Point for breach of the Facilities Agreement. The City obtained an interlocutory summary judgment on its breach of contract claim against Creek Point, as well as costs, interest, and attorney's fees. Creek Point then paid the funds, which were escrowed for the future road construction. Subsequently, the trial court granted the City's motion to dismiss with prejudice all its claims against Creek Point.

The Sefziks filed a motion for summary judgment, and the City filed a "second motion" for summary judgment, urging several grounds. The Sefziks responded to the City's motion, addressing all of the City's grounds. The trial court's final judgment expressly denied the Sefziks' motion, granted the City's second motion for summary judgment "based on waiver and estoppel (by assignor entering into a valid and enforceable Facilities Agreement)," and denied the City's second motion on all grounds other than waiver and estoppel. This appeal timely followed.

## II. STANDARD OF REVIEW

The standards for reviewing a summary judgment are well-established. The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex. 1972). A defendant moving for summary judgment must either (1) disprove at least one element of the plaintiff's theory of recovery, or (2) plead and conclusively establish each essential element of an affirmative defense. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 657 (Tex.App.-Dallas 1992, no writ). We should consider not only all those grounds the trial court ruled on, but also those grounds the trial court did not rule on but that are preserved for appellate review. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625–26 (Tex. 1996). To preserve the grounds, the party must raise them in the summary judgment proceeding and present them in an issue or cross-point on appeal. *Id.* at 626; *Carrico v. Kondos*, 111 S.W.3d 582, 585 (Tex. App.-Fort Worth 2003, pet. denied). "When both parties move for summary

judgment, the trial court may consider the combined summary-judgment evidence to decide how to rule on the motions." *Jon Luce Builder, Inc. v. First Gibraltar Bank, F.S.B.*, 849 S.W.2d 451, 453 (Tex. App.-Austin 1993, writ denied) (per curiam).

## III. APPLICABLE LAW

■ Article I, section 17 of the Texas Constitution prohibits the taking of private property for public use without just compensation. TEX. CONST. art. I, § 17; *see Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex.1998). This provision and the Just Compensation Clause of the Fifth Amendment to the United States Constitution, applied to the individual states through the Fourteenth Amendment, were "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)

■ Takings can be classified as either physical or regulatory. *Mayhew*, 964 S.W.2d at 933. A physical taking occurs when the government authorizes an unwarranted physical occupation of an individual's property. *Id.* A regulatory taking may occur when a government conditions the granting of a permit or some other type of government approval on an exaction from a landowner seeking that approval. *See Dolan v. City of Tigard*, 512 U.S. 374, 377, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 625 (Tex.2004). In an exaction takings case, some action is required—exacted—from the landowner as a condition to obtaining governmental approval. *Town of Flower Mound*, 135 S.W.3d at 625.

■ The Texas Supreme Court has adopted a "rough proportionality" test to determine whether an exaction constitutes a taking:

> [C]onditioning government approval of a development of property on some exaction is a compensable taking unless the condition (1) bears an essential nexus to the substantial advancement of some legitimate government interest and (2) is roughly proportional to the projected impact of the proposed development.

*Id.* at 634; *see Dolan*, 512 U.S. at 391, 114 S.Ct. 2309; *Nollan v. Ca. Coastal Comm'n*, 483 U.S. 825, 837, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). The government must make an "individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Town of Flower Mound*, 135 S.W.3d at 633 (citing *Dolan*, 512 U.S. at 391, 114 S.Ct. 2309). Thus, the burden of proof is on the government to prove that the condition imposed meets the test. *Id.* at 644.

## IV. WAIVER AND ESTOPPEL

The City moved for summary judgment on several grounds, including waiver and estoppel. Specifically, the City asserted that

> Creek Point and the Sefziks were estopped from challenging and have waived any claim regarding either the Facilities Agreement or the payment because Creek Point requested the Facilities Agreement in lieu of the requirement under the City's subdivision regulations that it construct the portion of Wilmeth Road crossing its property and because neither Creek Point nor the Sefziks filed suit to contest the City Council's approval of the Facilities Agreement, or the conditions attached to the City Council's approval of Creek Point's site plan and plat, prior to ac-

cepting the benefits of the City Council's approval of those items.

The City argued that, by accepting "the benefits of Creek Point's administrative approval," Creek Point and the Sefziks have consented to the requirements they complain about. Further, the City argued that the Sefziks benefitted from the City's approval by selling the property at a profit. The trial court granted the City's motion based on "waiver and estoppel (by assignor entering into a valid and enforceable Facilities Agreement)," and denied the City's second motion on all grounds other than waiver and estoppel.

In their second issue, the Sefziks argue the trial court erred in ruling their taking claims are barred as a matter of law by waiver as a result of Creek Point's execution of the Facilities Agreement. They assert, among other arguments, that accepting the City's approval to develop the land—conditioned on an unconstitutional exaction—cannot, as a matter of law, waive a constitutional claim, and that the City did not prove all the elements of the affirmative defense of waiver as a matter of law.

■ In their third issue, the Sefziks argue that the trial court erred in ruling their taking claims are barred as a matter of law by estoppel as a result of Creek Point's execution of the Facilities Agree-

ment. They assert, among other arguments, that the City failed to prove two elements—false representation and detrimental reliance—of its estoppel affirmative defense.[4]

## A. TOWN OF FLOWER MOUND CASE

■ The premise of the City's "waiver and estoppel" arguments is that a landowner must challenge a condition to plat approval before obtaining final approval of the plat, that is, before "accepting the benefits" of development approval. This argument was rejected by the Texas Supreme Court in *Town of Flower Mound,* an opinion issued a few weeks after the trial court entered its judgment here. In that case the Town conditioned its approval of a subdivision development on a requirement that the developer rebuild some substandard streets abutting the development. The developer did so, but then sued the Town to recover its costs, claiming the condition imposed on the development was an unconstitutional taking. *Town of Flower Mound,* 135 S.W.3d at 622. Before considering whether the Town's action constituted a taking, the supreme court considered whether the developer's suit was barred because he did not sue until after he rebuilt the roads and obtained final approval of the development plan. *Id.* at 628. The Town urged the court to

---

4. In their first issue, the Sefziks contend that the trial court erred in granting the City's second motion for summary judgment as to the Sefziks' claims. The gist of this issue is their argument that the City's development exaction was a taking, as they argued in their motion for summary judgment. However, the Sefziks do not argue in their first issue or elsewhere, and do not raise as a separate issue on appeal, that the trial court erred in denying their motion for summary judgment. Moreover, the only relief they request is reversal and remand.

When both parties file motions for summary judgment and one is granted and the other denied, we may consider all questions presented and render the judgment the trial court should have rendered. *See Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988) (orig. proceeding) (per curiam). Here, however, the Sefziks presented no issue on appeal regarding the denial of their motion for summary judgment and have requested that we reverse and remand this case for further proceedings. Accordingly, whether the trial court erred in denying the Sefziks' motion for summary judgment is not an issue in this appeal. Because we address the Sefziks' arguments in our consideration of their second and third issues and the City's cross-points, we conclude the Sefziks' first issue presents nothing for review.

adopt a standard requiring developers to first seek to strike down conditions they believe are unconstitutional before accepting the conditions and irreparably changing the status quo.

The supreme court expressed what it described as an "obvious concern" that such a standard "would pressure landowners to accept the government's conditions rather than suffer the delay in a development plan that litigation would necessitate." *Id.*

The supreme court stated, "There is nothing in the statutory framework to suggest that the time for bringing an action like this one is constrained by anything other than the applicable statute of limitations, which the Town does not argue would bar the present action." *Id.* at 628–29 (citing sections of the local government code relating to municipal and county zoning and development regulations). Ultimately, the court concluded that "[n]o limitation barring [the developer's] suit exists, and we decline the invitation to create one." *Id.* at 630.

The City argues that *Town of Flower Mound* does not apply because Creek Point voluntarily entered into the Facilities Agreement and consented to the payment. But in *Town of Flower Mound*, the developer also voluntarily accepted the benefits of the development plan approval by rebuilding the road and obtaining final approval of its development plan; only then did he challenge the exaction as an unconstitutional taking and sue for reimbursement. The supreme court rejected the argument that the developer's actions to obtain governmental approval barred its takings claim.

■ The court in *Town of Flower Mound* noted that the Town did not attempt to characterize its argument as waiver or estoppel. However, the court observed that the developer "had objected to the condition at every opportunity, and the Town was well aware of [the developer's] position." *Id.* at 629. Here, there is evidence that Creek Point, like the developer in *Town of Flower Mound*, objected to the condition on its development "at every administrative level in the Town, all to no avail." *Id.* at 624. Kehoe stated in his affidavit that he and other Creek Point representatives complained to City officials about the requirement "but the [C]ity made it very clear that Creek Point would either have to construct that portion of New Wilmeth Road or enter into a Facilities Agreement to pay for a portion of New Wilmeth Road."[5] There is evidence that Creek Point objected to the construction requirement at the planning and zoning meeting; there, Creek Point representatives stated they "recognize their financial responsibility of constructing the road, and understand[ ] the purpose for which roadway impact fees were originally established, and this issue would be taken up at the time of platting." Creek Point representatives stated "they would be building a road midway across the creek, and this road would not lead to any developments at this time" and that building the road was "unreasonable."

---

5. The City contends that Kehoe's affidavit is based on inadmissible factual and legal conclusions and that it objected to the affidavit in the trial court. A complaint that an affidavit is nothing more than factual or legal conclusions is a substantive defect that can be raised for the first time on appeal. *See Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 112 (Tex.App.-Houston [14th Dist.] 2000, no pet.). However, the City's entire argument on appeal is "[t]hat affidavit testimony is based on inadmissible factual and legal conclusions, which [the City] also objected to in its reply to [the Sefziks'] response to [the City's] Second MSJ." We conclude the City has waived this complaint on appeal by inadequate briefing. *See* Tex.R.App. P. 38.1(h).

The City's representatives stated that to defer construction, Creek Point would have to request a facilities agreement.

At the city council meeting, Creek Point and the Sefziks objected to the assessment of New Wilmeth Road construction costs and requested modification of the Facilities Agreement to delete them. Although Kehoe testified by deposition that Creek Point was not "forced" to sign the Facilities Agreement, he stated further, "If we—if the agreement was not signed, then we would not have received our approval at the time that we did." Kehoe also testified that Creek Point did not have enough time to sue the City challenging the road payment before the transaction closed. In his affidavit, Kehoe detailed the funding deadlines for the development.

Thus the summary judgment evidence—viewed under the proper standard—shows the City imposed two alternate exactions as a condition to obtain its approval of the development—build a part of New Wilmeth Road now, or give the City the money now to build it later. By executing the Facilities Agreement, Creek Point chose one of the alternative exactions—it agreed to pay the City what it requested in lieu of building the road, and eventually it did so. But Creek Point's execution of the Facilities Agreement does not compel the conclusion as a matter of law that it agreed to the imposition of the condition and waived any claims for a regulatory taking.

■■■ In short, the only difference between *Town of Flower Mound* and here is that here the City imposed two alternative exactions (build the road or pay) as opposed to the Town of Flower Mound, which gave the developer no alternative to constructing the road itself. We consider this no basis for distinguishing the supreme court's holding in *Town of Flower Mound*. Instead, we conclude that choosing between alternative exactions does not bar a later challenge to the government's imposition of either exaction as being a regulatory taking. If it did, then governmental entities could avoid any exposure to exaction takings claims merely by structuring its regulations to exact one of two (or more) alternatives and requiring the landowner to "choose its poison." [6]

The City also argues that *KMST, LLC v. County of Ada*, 138 Idaho 577, 67 P.3d 56 (Id.2003), is similar to the instant case. There, a developer was required by the county highway district, as part of a proposed commercial development, to construct a road alongside the development and dedicate it to the public. Accordingly, in its initial land use application, the property owner stated that it would build the public road. *Id.* at 61. Later, the property owner challenged the requirement as an unconstitutional taking. The district court found "that as a general matter developers do not include conditions in their development applications if they disagree with the conditions" and that the developer included the construction and dedication of the road because of concerns that failing to do so would delay closing and development. The supreme court specifically found there was no taking because the developer itself proposed that it construct and dedicate the

---

6. Moreover, there is no waiver or release language in the Facilities Agreement. The Sefziks argued they produced evidence raising at least a fact issue as to waiver. They cited Kehoe's affidavit in which he stated he told the City that the payment was "unfair" and, further, that he did not intend to waive any claims by signing the Facilities Agreement.

In addition, Creek Point assigned its claims against the City to the Sefziks before it signed the Facilities Agreement, indicating that neither party considered Creek Point had waived a takings claim, and Creek Point did not make the payment until 2003, pursuant to a court order.

street as part of its development, based on the developer's statements in its initial land use application that it would build the public road. *Id.* Having "voluntarily decided to dedicate the road to the public in order to speed the approval of its development," it could not claim a taking. *Id.* The Idaho Supreme Court specifically stated that it was not holding there was no taking "simply because KMST built the public street before challenging that requirement in court." *Id.* at 61 n. 1. The developer's "voluntary" decision to build and dedicate the road—communicated in its initial application—distinguishes *KMST, LLC* from the facts here.

## B. WAIVER

 Because waiver is an affirmative defense, a defendant who moves for summary judgment on this basis must conclusively establish waiver. *Labrado v. County of El Paso,* 132 S.W.3d 581, 594 (Tex.App.-El Paso 2004, no pet.) (citing *Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 643 (Tex.1996)); *see* TEX.R. CIV. P. 94. Waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Avary v. Bank of Am., N.A.,* 72 S.W.3d 779, 788 (Tex.App.-Dallas 2002, pet. denied). Because the supreme court rejected "acceptance of the benefits" as a bar to a takings challenge and the Sefziks brought forward evidence raising a fact issue as to whether Creek Point intentionally relinquished its right to challenge the "build or pay" requirement, we conclude the trial court improperly granted the City's motion for summary judgment on grounds of waiver. We resolve the Sefziks' second issue in their favor.

## C. EQUITABLE ESTOPPEL

 Equitable estoppel is an affirmative defense that is established when:

(1) a false representation or concealment of material facts; (2) is made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted upon; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 515–16 (Tex.1998). Estoppel arises where, by the fault of one, another is induced to change his or her position for the worse. *Herschbach v. City of Corpus Christi,* 883 S.W.2d 720, 736 (Tex.App.-Corpus Christi 1994, writ denied). The Sefziks contend that the City failed to establish the elements of false representation and detrimental reliance. We agree. None of the City's evidence identifies a false representation by the Sefziks, or detrimental reliance by the City on anything other than the Facilities Agreement. Thus, the City's estoppel ground is based on the "acceptance of the benefits" argument, and the same authorities, which were argued to, and rejected by, the supreme court in *Town of Flower Mound.* *See Town of Flower Mound,* 135 S.W.3d at 629, nn. 45–49, 52. Accordingly, we conclude the trial court improperly rendered summary judgment in the City's favor on grounds of estoppel. We resolve the Sefziks' third issue in their favor.

## V. THE CITY'S CROSS–POINTS

Having concluded that waiver and estoppel do not support summary judgment in the City's favor, we consider the City's six cross-points, in which it argues that the trial court erred by denying summary judgment on the six remaining grounds asserted in its motion.

### A. Sovereign Immunity

 In its motion for summary judgment, the City also contended that the Sefziks' claim was barred by the City's

sovereign immunity from suit. Relying primarily on *General Services Commission v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 594 (Tex.2001), and *Freedman v. University of Houston*, 110 S.W.3d 504, 508 (Tex.App.-Houston [1st Dist.] 2003, no pet.), the City contended that, because the Sefziks were seeking damages based on allegations that a contract to which the City was a party (the Facilities Agreement) was unenforceable, and the Sefziks could not show the Legislature's express waiver of the City's immunity, sovereign immunity applied to bar the suit.

Both *Little–Tex Insulation Co.* and *Freedman* were breach of contract cases. Appellants in both cases argued that their claims for breach of contract constituted uncompensated takings of their personal property. The supreme court distinguished breach of contract cases from takings cases. Specifically, in a contract dispute, the State is acting "within a color of right under the contract and not under its eminent domain powers." *Little–Tex Insulation Co.*, 39 S.W.3d at 599. In a contract dispute, the State lacks the "requisite intent under constitutional-takings jurisprudence when it withholds property or money from an entity," that is, it lacks the intent to take property under its eminent domain power. *Id.* at 598–99; *see Freedman*, 110 S.W.3d at 509. Here, there is no allegation that the City breached a contract. Rather, the essence of the Sefziks' claim is that the City took their property under its eminent domain power by exacting the requirement that Creek Point either build New Wilmeth Road or agree to put up the money to build it by signing the Facilities Agreement. "The Constitution itself ... is a waiver of governmental immunity for the taking, damaging or destruction of property for public use." *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex.1980). Because the Sefziks alleged a takings claim, not a breach of

contract claim, this suit is distinguished from the waiver of sovereign immunity requirements pursuant to *Little–Tex Insulation Co.* and *Freedman*. This ground does not support summary judgment. We resolve the City's first cross-point against it.

**B. Standing**

In its motion for summary judgment, the City also contended that the Sefziks did not have standing to challenge either the Facilities Agreement between the City and Creek Point or the payment provided for in that agreement. The City argues that because the Sefziks are in the same position as Creek Point, and because Creek Point accepted the benefits of the City's approval of the development without challenging the validity of the Facilities Agreement or the payment, neither Creek Point nor its assignees, the Sefziks, can complain. This is the same argument the City made under its "waiver and estoppel" grounds. We have already concluded the "acceptance of the benefits" argument does not support summary judgment. We resolve the City's second cross-point against it.

**C. No Assignment of Claims**

In its motion for summary judgment, the City also contended that the Assignment and Agreement between Creek Point and the Sefziks did not assign any claims because Creek Point had no claims to assign. It is undisputed that the Assignment and Agreement—made after the City had made clear its position and before the Facilities Agreement was executed—provides that Creek Point "assigns to [the Sefziks] all rights it may have against the City as a result of the imposition of the Fees...." Rather, the City's argument hinges not on the text of the Assignment and Agreement, but on its contention that Creek Point had no such claims to assign

for the reasons discussed above. Having rejected this central argument, we conclude this ground will not support summary judgment. We resolve the City's third cross-point against it.

## D. Previous Summary Judgment Conclusively Established Validity of Facilities Agreement and Payment

In its motion for summary judgment, the City also contended that the trial court's January 14, 2003 interlocutory order granting the City summary judgment against Creek Point (for payment of the amounts due under the Facilities Agreement) conclusively established the validity of the Facilities Agreement and Creek Point's legal responsibility for payment of the fee. In the trial court and on appeal, the City relies on *Newco Drilling Co. v. Weyand*, 960 S.W.2d 654, 656 (Tex. 1998), for the proposition that "[a] partial summary judgment is a decision on the merits unless set aside by the trial court." The City argues that *Weyand* applies here because the first summary judgment decided that the Facilities Agreement was a valid, enforceable contract and Creek Point was legally responsible for the payment.

The only issue addressed by the trial court's January 14, 2003 interlocutory order was whether Creek Point breached the Facilities Agreement by not paying the $269,360. The Sefziks challenge the imposition of payment obligation as a taking; that issue was not decided by the January 14, 2003 order. Further, the January 14, 2003 order was implicitly set aside when the trial court granted the City's motion to dismiss—with prejudice—all claims against Creek Point. Because the entry of the earlier, interlocutory summary judgment didn't conclusively establish the validity of the Facilities Agreement and the payment as not being a taking, this ground will not support summary judgment. We resolve the City's fourth cross-point against it.

## E. No Taking

In its motion for summary judgment, the City also asserted that the Sefziks' claims regarding the Facilities Agreement were "contractual in nature" rather than a taking. The City argued that, since section 40–6 of its subdivision regulations required Creek Point, at the time it obtained city approval for its development, to construct the portion of New Wilmeth Road crossing its property and the obligation to pay the construction costs arose from the Facilities Agreement, then the payment obligation, and any assigned claim, was contractual in nature. Thus, citing *Freedman* and *Little–Tex*, the City argues it did not commit a "taking" of property by entering into the Facilities Agreement.

This is the same argument made under the City's first cross-point. Again, however, those cases involved parties asserting that the governmental entities' breaches of contract resulted in unconstitutional takings. Here, there is no allegation that the City engineered a taking through its breach of a contract. Rather, the Sefziks' claim is that the City effected an unconstitutional taking by imposing on Cedar Creek the alternative obligations to either build the road or pay to have it built later. Accordingly, this ground does not support summary judgment in the City's favor. We resolve the City's fifth issue against it.

In its motion for summary judgment, the City also asserted that neither Creek Point's execution of the Facilities Agreement nor the provision for the road construction payment was a taking because the subdivision regulations on which the Facilities Agreement and payment were based were a valid exercise of the City's police power. As noted in *City of College Station v. Turtle Rock Corp.*,

680 S.W.2d 802, 806, (Tex.1984), "municipalities can require the 'donation' of streets, alleys, water mains, and sewer mains as a condition to subdivision development."

However, whether the City's act is an exercise of its police power or of the power of eminent domain depends on the "essential characteristic" of the proceeding, not the label. *See DuPuy v. City of Waco,* 396 S.W.2d 103, 107 (Tex.1965). As stated in *DuPuy, id.* at 107 n. 3 (citation omitted):

> The distinguishing characteristic between eminent domain and the police power is that the former involves the taking of property because of its need for the public use while the latter involves the regulation of such property to prevent the use thereof in a manner that is detrimental to the public interest. The police power may be loosely described as the power of the sovereign to prevent persons under its jurisdiction from conducting themselves or using their property to the detriment of the general welfare. .... However, it is universally conceded that when land or other property is actually taken from the owner and put to use by the public authorities, the constitutional obligation to make just compensation arises, however much the use to which the property is put may enhance the public health, morals or safety.

Moreover, as noted in *City of Corpus Christi, v. Unitarian Church of Corpus Christi,* 436 S.W.2d 923, 930 (Tex.Civ.App.-Corpus Christi 1968, writ ref'd n.r.e.):

> In subdivision development, a city by statute and charter and/or ordinance is authorized to require the dedication of streets, alleys and utility easements as a part of the orderly development of a city proper. There is a difference concerning the statutorily authorized dedication of streets in subdivisions, and the exercise of the police power to take private property for street purposes without compensation. In subdivision development, the city is not taking private property for public use without compensation, but is merely regulating the use thereof.

This case illustrates the distinction between the exercise of police power and the exercise of the power of eminent domain in *City of College Station* and *City of Corpus Christi.* Here, the requirement to build or pay for New Wilmeth Road is not an exercise of police power regarding subdivision development because New Wilmeth Road is not a street in the Creek Point development, and in imposing the obligation the City was not regulating the use of New Wilmeth Road. What is being challenged here is not an obligation to dedicate the corner of the subdivision for the future extension of New Wilmeth Road. Instead, it is the obligation to pay for the road construction itself now, either by building the road or putting up the money to build it later. Accordingly, we conclude that summary judgment is improper on grounds that the road construction payment requirement was not a taking because it was a regulation of subdivision development pursuant to the police power.

The City also relied on cases regarding regulatory takings such as *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 122, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 932 (Tex. 1998). However, in *Town of Flower Mound,* the supreme court noted the "different analytical structures depending on the nature and effect of the regulation involved." *Town of Flower Mound,* 135 S.W.3d at 630. The court specifically distinguished cases involving the "unreasonable regulatory interference" analysis em-

ployed in *Penn Central* from cases like *Nollan* and *Dolan*, which involved "exactions imposed by the government as a condition of its approval of land development." *See id.* As noted above, this case is a development exaction takings case, not a regulatory interference takings case. Therefore, the tests stated in *Penn Central* and *Mayhew* do not apply here. We resolve the City's sixth issue against it.

## VI. CONCLUSION

Having resolved the Sefziks' second and third issues in their favor, and resolved the City's cross-points against it, we conclude the trial court improperly granted the City's second motion for summary judgment. Accordingly, the trial court's April 12, 2004 final judgment is reversed, and this case is remanded to the trial court for further proceedings.