**Opinion issued February 13, 2014**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-12-00730-CV

—————————————

**MIDTOWN EDGE, L.P., AND
MIDTOWN CONDOMINIUMS, L.L.C., Appellants
V.**

**THE CITY OF HOUSTON, Appellee**

---

**On Appeal from County Civil Court at Law No. 4
Harris County, Texas
Trial Court Case No. 1003812**

---

## MEMORANDUM OPINION

In this interlocutory appeal,[1] appellants, Midtown Edge, L.P., and Midtown

Condominiums, L.L.C. (collectively, "Edge"), challenge the trial court's order

granting the plea to the jurisdiction of appellee, the City of Houston ("the City"), in

---

[1]    TEX. CIV. PRAC. & REM CODE ANN. § 51.014(a)(8) (Vernon Supp. 2013).

Edge's suit against the City for breach of contract, inverse condemnation, declaratory judgment, and promissory estoppel. In four issues, Edge contends that the trial court erred in granting the City's plea.

We affirm.

## Background

In its petition, Edge alleges that in July 2005, it began construction of a condominium development project (the "Project"), consisting of ninety-three residential units, located in the Midtown area of Houston. After Edge applied to the City for use of its wastewater line, the City responded by letter, dated August 5, 2005, stating that a new wastewater line would need to be constructed because the existing eight-inch wastewater line in the vicinity of the Project was inadequate to accommodate the Project's needs. In its letter, the City listed various "methods" of financing the new line, noting that it could pay for all or some of the costs of design and construction, or Edge could choose to pay the costs on its own. If the City paid any portion of the costs, a contract between the City and Edge, approved by City Council and executed by the Mayor, would be required. The City noted that other financing methods could be used, including one in which Edge could "ask" the City to establish a connection charge for any other property owner subsequently connecting to the new line. To share the cost of constructing the line, such an owner would be required to pay a pro rata charge, which would then be

2

forwarded to Edge. The City explained that upon "completion of the construction of the line and acceptance of the project by the City, the line will be dedicated to the City of Houston for ownership and maintenance."

In its October 31, 2005 letter responding to the City's letter, Edge stated that it was "not requesting City of Houston cost sharing participation," it "underst[ood] that all cost sharing participation require[d] an approved contract by city council prior to the construction of the utility," and it understood that "requesting such participation may result in the delay of a building permit being issued."

Subsequently, the City issued a construction permit, and Edge constructed the new line at a cost of $224,991.02. Upon completion, Edge dedicated the new line to the City for its ownership and maintenance.

At some point, Pierce Street Flats (the "Flats"), a new apartment complex constructed in the vicinity of the Project, connected to the new line. In 2007, Edge applied to the City for reimbursement of $48,664, which it alleges was the Flats's pro rata share of Edge's cost to construct the new line. And Edge notified the Flats that it was responsible for a share of the construction costs of the new line. The City denied reimbursement, and the Flats disconnected from the new line and connected to the older eight-inch wastewater line.

Edge further alleges in its petition that the City's letter concerning financing of the new line constituted "a letter agreement," a "valid, enforceable agreement"

3

between the City and Edge. It asserts that the City breached its obligations "under this contract" by denying Edge's request for reimbursement after the Flats connected to the new line. And it further alleges that the Texas Legislature has waived the City's governmental immunity for purposes of such a breach–of–contract claim.[2]

Edge argues that the City, by denying reimbursement, committed an unconstitutional "taking" because it intentionally took the new line for the benefit of the public without compensating Edge and without Edge's consent. Edge seeks a judgment declaring that (1) it constructed the line "pursuant to a valid and enforceable contract and municipal ordinance," not only for its own benefit, but for the benefit of the City and the public; (2) the City breached the contract by denying reimbursement; and (3) the City violated Edge's rights under the Texas Constitution by taking Edge's property without adequate compensation. Alternatively, Edge asserts a claim for promissory estoppel, alleging that the City made a promise, upon which Edge relied to its detriment, to reimburse Edge. Finally, Edge claims that the Flats has been unjustly enriched.[3]

In its answer, the City generally denies Edge's allegations, and it asserts that it is immune from suit. In its second amended plea to the jurisdiction, the City

---

[2]    *See* TEX. LOC. GOV'T CODE ANN. § 271.152 (Vernon 2005).

[3]    The Flats is a named defendant in the proceedings below. However, it is not subject to the order sustaining the City's plea to the jurisdiction, and it is not a party to this appeal.

4

argues that Edge's "breach of contract claim is barred by governmental immunity from suit" because the City's letter, "which Edge claims is the agreement upon which its breach of contract claim is based" is not a contract. The City asserts that Edge's inverse condemnation claim is barred by immunity, and it argues that there has not been an unconstitutional "taking" because Edge consented to the City's ownership of the new line by dedicating it to the City without objection. Further, the City asserts that Edge's claims for declaratory relief and promissory estoppel are barred by governmental immunity.

To its plea, the City attached its letter to Edge, Edge's letter to the City, and the affidavit of R. Moreno, the City's Division Manager of the Department of Public Works and Engineering (the "Department"), Utilities Analysis Section. In his affidavit, Moreno testified that he reviewed the City's records and they reveal that "since September 10, 2008, the date that Houston's City Council . . . approv[ed] the pro-rata reimbursement, no permit has ever been issued by [the City] to any person located within the service area . . . to connect to the [new line] and no money has been collected for the benefit of [Edge] from any third party." He noted that the City issued a permit to Black Finn Restaurant in August 2011 to connect to a terminating manhole on the new line, but the City did not collect a connection fee because the restaurant is "not located within the service area."

The City also attached to its plea the affidavit of R. Mendez, an inspector for the Department. Mendez testified that the Flats's contractor had inadvertently tapped into the new line, the City had not granted the Flats permission to tap into the new line, the City instructed the Flats to disconnect from the line, and the Flats complied.

Further, the City attached to its plea the affidavit of A. Sheridan, a Department Supervising Engineer, who testified that Edge did not file the documents necessary to complete its application for establishment of a pro-rata reimbursement (rate) until July 2008.[4] He noted that on September 10, 2008, the City Council established a rate for connections to the New Line.

After a hearing, the trial court granted the City's plea to the jurisdiction and dismissed Edge's claims.

**Plea to the Jurisdiction**

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Villarreal v. Harris Cnty.*, 226 S.W.3d 537, 541 (Tex. App.— Houston [1st Dist.] 2006, no pet.). We review de novo a trial court's ruling on a jurisdictional plea. *See Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Texas Political Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323 (Tex.

---

[4] Edge sought reimbursement in 2007 for the connection pertaining to the Flats.

2006); *City of Houston v. Vallejo*, 371 S.W.3d 499, 501 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the trial court's jurisdiction. *Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). We construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent. *Id.* at 226. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction, but do not affirmatively demonstrate incurable defects in jurisdiction, the plaintiff should be given an opportunity to amend. *Id.* at 226–27. If the pleadings affirmatively negate the trial court's jurisdiction, then a plea to the jurisdiction may be granted without allowing an opportunity to amend. *Id.* at 227.

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider the parties' relevant evidence submitted when necessary to resolve the jurisdictional issues raised. *Id.* If the evidence creates a fact question regarding jurisdiction, a plea to the jurisdiction cannot be granted and a factfinder must resolve the factual issue. *Id.* at 228. If the relevant evidence is undisputed or fails to raise a fact issue concerning jurisdiction, the plea to the jurisdiction must be determined as a matter of law. *Id.*

When reviewing a plea to the jurisdiction in which the pleading requirement has been met and evidence, which implicates the merits of the case, has been submitted to support the plea, we take as true all evidence favorable to the nonmovant and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id*. at 227.

## Jurisdictional Limits and Ripeness

As threshold matters, the City argues that the trial court did not err in granting its plea to the jurisdiction because Edge's claims exceed the jurisdictional limits of the county court and they are not ripe for adjudication.

Jurisdiction in statutory county courts includes "civil cases in which the matter in controversy exceeds $500 but does not exceed $200,000, excluding interest, statutory or punitive damages and penalties, and attorney's fees and costs, as alleged on the face of the petition." TEX. GOV'T CODE ANN. § 25.0003(c)(1) (Vernon Supp. 2013). On the face of its petition, Edge seeks reimbursement of $48,664 and other unspecified amounts. Thus, Edge states a claim within the jurisdictional limits of the county court. Although Edge asserts that it paid $224,991.02 to construct the new line, it does not seek this amount as its alleged damages.

The City argues that Edge's claims are not ripe because Edge does not "claim that the City has ever issued a permit to any third party located within the

8

service area to connect to [the new line] or collected any money in accordance with the terms" of the City Council's approval of the pro-rata reimbursement.

Ripeness implicates subject-matter jurisdiction and emphasizes the requirement of a concrete injury in order to present a justiciable claim. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000). Ripeness concerns whether, at the time a lawsuit is brought, the facts have developed sufficiently such that an injury has occurred or is likely to occur, rather than being contingent or remote. *Patterson v. Planned Parenthood of Houston and Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998); *City of Houston v. Norcini*, 317 S.W.3d 287, 292 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). To establish that a claim is ripe based on an injury that is likely to occur, the plaintiff must demonstrate that the injury is imminent, direct, and immediate, and not merely remote, conjectural, or hypothetical. *Gibson*, 22 S.W.3d at 852. By focusing on the concreteness of injury, the ripeness doctrine allows a court to avoid premature adjudication and issuance of advisory opinions. *Id.*

Here, it is undisputed that the Flats connected to the new line, and, in 2007, Edge sought reimbursement, which the City declined. In its original petition, Edge alleged that an injury had occurred because the City allowed the Flats to connect to the new line without collecting sums owed to Edge.

9

Considering Edge's allegations and jurisdictional evidence, taking as true all evidence favorable to Edge and indulging every reasonable inference and resolving any doubts in its favor, as we must, we conclude that Edge alleges that a concrete injury has occurred. Moreover, it is undisputed that, during the pendency of this suit, Black Finn Restaurant connected to some portion of the new line.

Accordingly, we conclude that Edge states claims within the trial court's jurisdictional limits and they are ripe for adjudication.

**Governmental Immunity**

Governmental immunity exists to protect subdivisions of the State, including municipalities like the City, from lawsuits and liability for money damages. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 & n.2 (Tex. 2008); *City of Houston v. Vallejo*, 371 S.W.3d 499, 502 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). The doctrine of governmental immunity encompasses two distinct concepts: (1) immunity from liability, which bars enforcement of a judgment against a governmental entity, and (2) immunity from suit, which bars the suit altogether unless the legislature has expressly given consent. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006).

*Breach of Contract*

In its first issue, Edge argues that the trial court erred in granting the City's plea to the jurisdiction on its breach-of-contract claim because the Texas

10

Legislature waived the City's immunity from such suits. *See* TEX. LOC. GOV'T CODE ANN. § 271.152.

A governmental entity waives immunity from liability when it contracts with private citizens, but it does not waive immunity from suit. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006); *Freedman v. Univ. of Houston*, 110 S.W.3d 504, 506 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Generally, a party seeking redress against a governmental unit for breach of contract must establish legislative consent to sue by bringing suit under a special statute or obtaining a legislative resolution. *See Tooke*, 197 S.W.3d at 332; *Freedman*, 110 S.W.3d at 506–07.

The Local Government Code provides that,

[a] local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE ANN. § 271.152; *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011) ("[Section 271.152] by clear and unambiguous language waives a governmental entity's immunity from suit for breach of written contract.").

The parties do not dispute that the City is a governmental entity authorized to enter into contracts. *See Williams*, 353 S.W.3d at 135 (determining that City of Houston is "a local governmental entity . . . that is authorized by statute or the

11

constitution to enter into a contract"). The parties dispute whether they entered into "a contract subject to this subchapter." *See* TEX. LOC. GOV'T CODE ANN. § 271.152. A "[c]ontract subject to this subchapter" is (1) a written contract, (2) stating the essential terms of the agreement, (3) for providing goods or services, (4) to the local governmental entity, (5) that is properly executed on behalf of the local governmental entity. TEX. LOC. GOV'T CODE ANN. § 271.151(2) (Vernon 2005).

Edge argues that the following documents, taken together, constitute a contract under section 271.151(2):

1. The City's August 5, 2005 letter to Edge
2. Edge's October 29, 2005 letter to the City's Permit Office
3. Edge's October 31, 2005 letter to the City
4. The City's April 30, 2008 certificate of final completion
5. Houston City Council Motion 2008-0698, establishing a pro rata reimbursement rate for the new line
6. City of Houston Ordinances, sections 47–168 through 47–170

*See id.* "A court may determine, as a matter of law, that multiple documents comprise a written contract." *Williams*, 353 S.W.3d at 137. "When an ordinance evidences a contract, and is sought to be enforced as one," it is construed as any other contract. *Id.* Documents and ordinances may be read together as a single agreement. *Id.*

We first consider whether the cited documents and ordinances comprise "a written contract." TEX. LOC. GOV'T CODE ANN. § 271.151(2). Parties form a

12

binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Prime Prods., Inc. v. S.S.I. Plastics, Inc*., 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). "'Meeting of the minds' describes the mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract." *Potcinske v. McDonald Prop. Invs.,* 245 S.W.3d 526, 529–30 (Tex. App.—Houston [1st Dist.] 2007, no pet.). No particular words are required to create a contract. *Williams*, 353 S.W.3d at 137. To be enforceable, however, a contract must be sufficiently certain to enable a court to determine the rights and responsibilities of the parties. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

Edge argues that the City's August 5, 2005 letter constitutes an offer. To prove a valid offer, a party must show (1) the offeror intended to make an offer; (2) the terms of the offer were clear and definite; and (3) the offeror communicated the essential terms of the offer to the offeree. *Paciwest v. Warner Alan Props., LLC*, 266 S.W.3d 559, 569 (Tex. App.—Fort Worth 2008, pet. denied) (citation omitted).

The City, through its letter, informed Edge that a new wastewater line extension was necessary, and it directed Edge to have its engineer determine "if the sanitary sewer extension is feasible and ensure that the sanitary sewer extension will comply with all City of Houston Specifications and Standards." The City noted that if the sewer extension was feasible, "there [were] five (5) options available" for [Edge's] proposed construction:

(1)  [Edge] may have the line designed and constructed at [its] expense, with or without the participation of nearby property owners. If this method is chosen, [Edge] can ask that the City establish a connection charge for this sewer, whereby any property owner making a connection to the line would be required to pay a pro rata share of the cost of constructing the line; the pro rata share would be based on the area of the property fronting the privately funded sewer.

(2)  [Edge] may enter into an agreement with the City whereby [Edge] will pay one hundred percent (100%) of the cost to design the line and the City will assume thirty percent (30%) of the construction expenses. . . . Changes to Chapter 47 of the Code of Ordinances . . . allow the City to establish a connection charge for this sewer, whereby any property owner making connection to the line would be required to pay a pro-rata share of the developer's portion of the cost of constructing the line . . . .

(3)  [Edge] may enter into an agreement with the City whereby the City will pay 100% of the design cost of the line and 70% of construction costs . . . .

(4)  [Edge] may enter into an agreement with the City whereby [Edge] will pay one hundred percent (100%) of the cost to design the line and the City will assume fifty percent (50%) of the construction expenses [with pro-rata reimbursement available].

(5)  [Edge's] request will be placed in a program along with other similar projects. The City will install the required sanitary sewer

14

line when funds become available. There are no immediate plans to construct this line.

The City also noted that if it was to participate in the construction of the line, "a contract between the City and the developer must be approved by Council and executed by the Mayor."

The City left open a number of contingencies. It directed Edge to have its engineer determine "*if* the sanitary sewer extension [was] feasible," and it informed Edge that, if feasible, there were "methods" available for financing the project. (Emphasis added.) Edge then had to choose among the various methods. Thus, the terms of any purported offer were not clear and definite. *See Paciwest*, 266 S.W.3d at 569. The fact that some of the financing methods required that "a contract between the City and the developer . . . be approved by Council and executed by the Mayor" demonstrates that the City did not intend to create a binding agreement through its August, 5, 2005 letter. In addition, the City noted in its letter that "the owner *can ask* that the City establish a connection charge for this sewer." Thus, the City did not promise to establish such a connection charge.

The City also referenced Chapter 47 of the City's Code of Ordinances. Section 47-164, "Construction by Developers under Developer Contract," states that "the City may share in the expense of construction" and provides for the cost-sharing methods listed in the letter. *See* HOUSTON, TEX., CODE OF ORDINANCES § 47-164 (2010). Section 47-168 provides specific procedures for a developer to

15

apply to the City for pro-rata reimbursement. *Id.* § 47–168 (2000). Section 47-170 states, "For a period of 15 years after acceptance by the department of the completed off-site main, the permittee shall be entitled to reimbursement for connections from the proceeds of the pro-rata charges established herein." *Id.* § 47-170 (1996). Section 47-170 also provides a semi-annual payment structure. *Id.*

Although section 47-170 states, "the permittee *shall be entitled* to reimbursement," section 47-168 shows that there is an application process that must be undertaken prior to being entitled to reimbursement. *Id.* § 47-168 (emphasis added). Thus, in its letter, the City could not have promised that Edge would receive pro-rata reimbursement as there was yet an application process that Edge was required to undertake *after* the line was constructed and approved by the City.

Further, section 47-167 provides, in pertinent part, that "[i]t is intended by these provisions merely to furnish to the permittee a means of reimbursing himself from other private persons similarly situated . . . and not in any manner to obligate the city to pay or cause to be paid any sum of money on account thereof or to vest in any persons constructing such main any private right against the city of the public use." *Id.* § 47-167 (1996). Thus, the City expressly disclaimed any intent to be bound.

16

Moreover, nothing in Edge's certificate of completion or the City Council's approval of a pro-rata reimbursement rate evidences an intent to be bound to make payment.

"A promise, acceptance of which will form a contract, is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Williams*, 353 S.W.3d at 138. The documents referred to by Edge, whether read singularly or in conjunction with one another, do not show that the City intended to be bound to a specific course of action. Because they do not constitute an offer, Edge's October 31, 2005 letter cannot operate as an acceptance. And, thus, no contract was formed.

We conclude that the requirements of section 271.151 were not met and the waiver of governmental immunity under section 271.152 does not apply. Accordingly, we hold that the trial court did not err in granting the City's plea to the jurisdiction on Edge's claim for breach of contract.

We overrule Edge's first issue.

### *Declaratory Judgment*

In its third issue, Edge argues that because it "established the City's waiver of immunity from suit under Section 271.152," the trial court also has jurisdiction "to entertain Edge's request for a declaratory judgment."

The Uniform Declaratory Judgment Act ("DJA") is a "remedial statute designed 'to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002) (quoting TEX. CIV. PRAC. & REM. CODE § 37.002(b)). A declaratory-judgment suit made against a governmental unit by a plaintiff seeking to establish a contract's validity, enforce performance under a contract, or impose contractual liabilities, cannot be maintained without legislative permission. *See id.* at 855–56. Private parties cannot circumvent immunity from suit by characterizing a suit for money damages, such as a contract dispute, as a declaratory-judgment claim. *See id.* at 856.

In its petition, Edge seeks a declaration that

> [Edge], pursuant to a valid and enforceable contract and municipal ordinances, constructed the new line not only for its benefit, but for the benefit of [the City] and the public, and that [the City] has breached this contract by denying [Edge's] request for reimbursement of a pro-rata share of its construction expenses, and [the City] has violated [Edge's] rights under the Constitution of the State of Texas by taking [Edge's] personal property without adequate compensation.

Thus, as the City argues, Edge seeks a declaratory judgment in an attempt to have a determination made on its breach-of-contract claim. *See id.* at 860. Having held that Edge did not establish a waiver of immunity on its breach-of-contract claim, its request for declaratory relief cannot be maintained. *See id.* Accordingly,

18

we hold that the trial court did not err in granting the City's plea to the jurisdiction on Edge's declaratory-judgment claim.

Accordingly, we overrule Edge's third issue.

### *Inverse Condemnation*

In its second issue, Edge argues that "the trial court erred in granting the City's plea to the jurisdiction because Edge established a valid takings claim." Edge asserts that it "was required to build a new wastewater line, which provides a benefit for the City's public use and expansion," and "the City exacted a benefit from Edge and should be required to compensate Edge for the same." *See Town of Flower Mound v. Stafford Estates, L.P.*, 71 S.W.3d 18, 30 (Tex. App.—Fort Worth 2002) ("Flower Mound I"), *aff'd*, 135 S.W.3d 620 (Tex. 2004) ("Flower Mound II") and *Sefzik v. City of McKinney*, 198 S.W.3d 884, 895 (Tex. App.—Dallas 2006, no pet.).

The Texas Constitution prohibits the State from taking private land for public use as follows:

> No person's property shall be taken, damaged or destroyed for, or applied to public use, without adequate compensation being made, unless by the consent of such person.

TEX. CONST. art. I, § 17. A distinct category of takings occurs when the government conditions the approval of permits "on an exaction from the approval-seeking landowner." *Flower Mound I*, 71 S.W.3d at 30. Any requirement that a

developer provide or do something as a condition to receiving municipal approval is an exaction. *Flower Mound II*, 135 S.W.3d at 625.

In *Flower Mound I*, as a condition of plat approval, the town of Flower Mound required a landowner to rebuild a road abutting his property at his own expense in accord with a town ordinance. *See Flower Mound II*, 135 S.W.3d at 623. The landowner sought an exemption from the ordinance and objected to the requirement "at every administrative level." *Id*. at 624. The town approved the landowner's plat and the landowner rebuilt the road and transferred the improvement to the town. *Id*. After the town refused to reimburse the landowner for its proportionate share of the expenses, he sued the town. *Id*. The town argued that the landowner had waived his takings claim by failing to sue *before* the town approved the plat and by accepting the benefit received in exchange for the exaction, namely, approval of its plat. *Flower Mound I*, 71 S.W.3d at 27. On appeal, the court of appeals rejected the town's waiver argument, emphasizing that the landowner "did unsuccessfully object to the [road] improvements condition at every administrative level within the Town." *Id*. at 28. The Texas Supreme Court likewise rejected the municipality's argument, noting that the landowner had objected at every opportunity. *Flower Mound II*, 135 S.W.3d at 630.

Here, unlike in the *Flower Mound* cases, Edge alleges in its petition that it chose to construct the new line at its own expense. Edge attached to its petition the

20

City's August 5, 2005 letter in which the City informed Edge that, upon completion, the new wastewater line was to be dedicated to the City "for ownership and maintenance." Edge does not allege that it objected at any stage. By choosing to construct the new line at its own expense and adopting *without objection* the City's requirements, Edge consented to those requirements. *See* TEX. CONST. art. I, § 17 (prohibiting taking without compensation *or consent*).

When, as here, a plaintiff fails to assert facts that constitute a taking, dismissal of the claim for want of jurisdiction is appropriate. *See Gen. Servs. Comm'n v. Little–Tex Insulation, Co.*, 39 S.W.3d 591, 599 (Tex. 2001) (dismissing inverse-condemnation claim for want of jurisdiction because allegations did not state takings claim). Accordingly, we hold that the trial court did not err in granting the City's plea to the jurisdiction on Edge's inverse-condemnation, or "takings," claim.

We overrule Edge's second issue.

### Promissory Estoppel

In its fourth issue, Edge argues that its "promissory estoppel claim is not barred by immunity" because the City promised Edge reimbursement for subsequent connections to the new line, Edge relied on this promise when it constructed the new line at its own expense, and the City "broke its promise" when

21

the Flats connected to the new line and "continues to do so in the case of the Black Finn Restaurant."

Absent a clear and unambiguous legislative waiver, the City is immune from suit in the performance of its governmental functions. *Tooke*, 297 S.W.3d at 469. In its plea to the jurisdiction, the City argues that Edge did not plead a legislative waiver of the City's immunity from its claim for promissory estoppel and none exists.

In its response to the City's plea, Edge asserts that an exception applies. Specifically, a municipality may be estopped "where justice requires the application of estoppel and there is no interference with the exercise of its government functions." *See Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350, 366 (Tex. App.—Texarkana 2002, pet. denied). Edge argues that this case presents such an exception because the City's failure to honor its promise to reimburse Edge "constitutes a grave injustice." Edge did not address in its response below the matter of interference with the exercise of governmental functions.

The exception is available "only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice." *City of White Settlement v. Super Wash, Inc.,* 198 S.W.3d 770, 774 (Tex. 2006). In *City of White Settlement*, the court stated that it had "applied the exception in only one circumstance," namely, where there was evidence that city officials had

affirmatively misled the parties seeking to estop the city and the misleading statements resulted in the permanent loss of the parties' claims. *Id.* at 775.

We conclude that Edge does not present an exceptional case in which justice requires estoppel. Accordingly, we hold that the trial court did not err in granting the City's plea to the jurisdiction on Edge's promissory-estoppel claim.

We overrule Edge's fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Brown.